# United States Court of Appeals for the Federal Circuit

---

**MILITARY-VETERANS ADVOCACY INC.,**
*Petitioner*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

---

2020-1537

---

Petition for review pursuant to 38 U.S.C. Section 502.

---

Decided: March 22, 2023

---

JEFFREY T. QUILICI, Orrick, Herrington & Sutcliffe LLP, Austin, TX, argued for petitioner. Also represented by MELANIE L. BOSTWICK, Washington, DC; MELANIE HALLUMS, Wheeling, WV; JOHN B. WELLS, Law Office of John B. Wells, Slidell, LA.

MEEN GEU OH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BRIAN M. BOYNTON, ERIC P. BRUSKIN, MARTIN F. HOCKEY, JR.; BRIAN D. GRIFFIN, BRANDON A. JONAS, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

---

Before NEWMAN, PROST, and CUNNINGHAM, *Circuit Judges.*

NEWMAN, *Circuit Judge.*

Military-Veterans Advocacy Inc. ("MVA") brings this petition pursuant to 38 U.S.C. § 502 and asks the court to review and revise certain instructions and practices of the Secretary of Veterans Affairs ("VA"), as set forth in the *Veterans Affairs Adjudication Procedures Manual* (the "M21-1 Manual"). This Manual provides guidance and instructions to the administrators of veterans' benefits and claims, by interpreting and coordinating the application of statutes, regulations, policies, and judicial decisions. Thus the M21-1 Manual "limits VA staff discretion, and, as a practical matter, impacts veteran benefits eligibility for an entire class of veterans." *Nat'l Org. of Veterans' Advocates v. Sec'y of Veterans Affs.*, 981 F.3d 1360, 1374 (Fed. Cir. 2020) (en banc) ("*NOVA*").

BACKGROUND

### *Section 502 Judicial Review*

Direct judicial review of certain VA actions and practices is authorized as follows:

> 38 U.S.C. § 502. **Judicial review of rules and regulations.**— An action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers is subject to judicial review. Such review shall be in accordance with chapter 7 of title 5 and may be sought only in the United States Court of Appeals for the Federal Circuit.

Section 502 establishes Federal Circuit jurisdiction for direct review of VA actions concerning "substantive rules of general applicability, statements of general policy and interpretations of general applicability" that must be published in the Federal Register, as provided by the

Administrative Procedure Act ("APA") at 5 U.S.C. § 552(a)(1)(D). *LeFevre v. Sec'y of Veterans Affs.*, 66 F.3d 1191, 1196 (Fed. Cir. 1995). These administrative rules, policies, and interpretations are the substance of the M21-1 Manual.

Section 553(e) provides "the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). Judicial review is available when the right to petition for rulemaking is denied, as well as when the petition is denied on its merits. *Preminger v. Sec'y of Veterans Affs.*, 632 F.3d 1345, 1351–53 (Fed. Cir. 2011). However, the Secretary errs in stating that the court does not thereby have jurisdiction to review the result when the agency grants a request for rulemaking but does not provide the relief sought by the requester. *See* Sec'y Br. 39; *Preminger*, 632 F.3d at 1352 ("Indeed, when Congress reported out § 502 it apparently contemplated that § 502 would provide for review of the Secretary's decision not to issue a rule as well as the decision to issue a rule.") (citing H.R. REP. NO. 100-963 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5782, 5786).

The APA requires the reviewing court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action" to the extent necessary to reach a decision. 5 U.S.C. § 706. Section 502 of Title 38 provides further oversight of agency actions with respect to veterans' concerns. *See* 38 U.S.C. § 502.

### *Legislation and Rules Relating to the Presumption of Exposure to Agent Orange*

MVA asks the court to review certain presumptions and procedures concerning Vietnam era exposure to the Agent Orange defoliant. MVA's petition is directed to VA practices described in the M21-1 Manual (1) at Section IV (ii)(1)(H)(4)(a) and Section IV (ii)(1)(H)(4)(b) (the "Thailand Rules"), (2) at Section IV (ii)(1)(H)(1) (the "Blue Water

Navy Rule"), and (3) at Section IV (ii)(2)(C)(3)(e) (the "Airspace Rule"). These rules are founded on legislation that arose as veterans of the Vietnam era developed illnesses, such as non-Hodgkin's lymphoma and other cancers, that came to be understood as related to exposure to Agent Orange.

Early legislative action concerning Agent Orange exposure is seen in the Veterans Health Programs Extension and Improvements Act of 1979, Pub. L. No. 96-151, § 307; 93 Stat. 1092, 1097–98 (1979), in which Congress required the VA to conduct a study of long-term health effects on Vietnam veterans who were exposed to dioxins that were components of Agent Orange. After study by the Centers for Disease Control ("CDC") in 1982, *see* H.R. REP. NO. 98-592 at 5 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4449, 4451–52, Congress enacted the Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Pub. L. No. 98-542, 98 Stat. 2725 (1984) (the "Dioxin Act"). The Dioxin Act directed the VA to establish guidelines for diseases shown by "sound scientific or medical evidence" to be associated with herbicides, including Agent Orange, containing dioxins. *Id.* §§ 5(a)(1)(A), 5(b)(2)(B), 98 Stat. at 2727–29.

The Dioxin Act also instructed the VA to presume that a veteran experienced toxic herbicide exposure "if the information in the veteran's service records and other records of the Department of Defense is not inconsistent with the claim that the veteran was present where and when the claimed exposure occurred." *Id.* § 5(b)(3)(B). In 1986, the VA promulgated 38 C.F.R. § 3.311a, a regulation presuming exposure to herbicides containing dioxins for veterans who "served in the Republic of Vietnam." 38 C.F.R. § 3.311a(b) (1986). This presumption applied to service in mainland Vietnam, as well as "service in the waters offshore and service in other locations, if the conditions of service involved duty or visitation in the Republic of Vietnam." *Id.* § 3.311a(a)(1).

In 1990, the CDC reported the results of a comprehensive study, showing a statistically significant relation between service in Vietnam and illnesses such as non-Hodgkin's lymphoma and other cancers. *See* The Association of Selected Cancers with Service in the U.S. Military in Vietnam: Final Study, *I. Non-Hodgkin's Lymphoma*, 150 ARCHIVES INTERNAL MED. 2473 (1990); *see also* Claims Based on Service in Vietnam, 55 Fed. Reg. 43123, 43124 (Oct. 26, 1990) (38 C.F.R. pts. 3, 4).

There followed the Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11. This Act established a presumption of service connection for veterans afflicted with designated illnesses who "served in the Republic of Vietnam." *Id.* § 2 (codified as amended at 38 U.S.C. § 1116). The legislative history records the congressional understanding that the VA could amend the list of diseases for which Agent Orange service connection would be presumed, after considering the advice of the National Academy of Sciences. *See* 137 CONG. REC. H719-01 (1991). The M21-1 Manual provided instructions, forms, questionnaires, and other guidance for implementation by the VA's regional offices throughout the nation, establishing "service in Vietnam" if a veteran received the Vietnam Service Medal. *See* M21-1 Manual § 4.08(k)(1) (Nov. 8, 1991) (citation omitted). However, in 2002 the VA amended the M21-1 Manual, replacing the Vietnam Service Medal test for presumptive "service in the Republic of Vietnam," and instead requiring veterans to show a "foot-on-land" or "boots-on-the-ground" presence within Vietnam during their service. *See* M21-1 Manual, Pt. III, para. 4.24(e)(1) (Feb. 27, 2002).

Studies of medical causation and service relation continued as the nation's experience with diseases associated with Agent Orange enlarged with an aging veteran population. *See, e.g.*, Herbicide Exposure and Veterans With Covered Service in Korea, 74 Fed. Reg. 36640-02 (July 24, 2009) (proposed rule).

Representative Bob Filner, the Chairman of the House Committee on Veteran Affairs, introduced the Agent Orange Equity Act of 2009 to clarify that 38 U.S.C. § 1116 includes veterans who served in waters offshore of Vietnam or at any level of airspace above Vietnam, or who received the Vietnam Service Medal. *See* H.R. 2254, 111th Cong. § 2 (2009). The bill was not enacted, although it received hearings. *See* Vietnam Veterans Longitudinal Study, 2010 WL 1785800 (May 5, 2010).

Congressional attention continued in 2013, when the Blue Water Navy Vietnam Veterans Act of 2013 was introduced. *See* H.R. 543, 113th Cong. (2013). This bill would have extended the presumption of service connection to include service on the territorial seas of Vietnam. Several versions of the bill were reintroduced over the next six years. *See, e.g.*, S. 681, 114th Cong. (2015); H.R. 299, 115th Cong. (2018).

Several states, including Hawaii, Alaska, and Arizona, urged Congress to assure the presumption of service connection to veterans who "served in the waters defined by the Combat Zone" and "in the airspace over the Combat Zone" in Vietnam. 160 CONG. REC. S3290-05, S2393 (May 22, 2014) ("Congress is respectfully urged [by the House of Representatives of Hawaii] to restore the presumption of a service connection for Agent Orange exposure to United States veterans who served in the waters defined by the Combat Zone and in the airspace over the Combat Zone in Vietnam . . . ."); 160 CONG. REC. S6197-01, S6201 (Nov. 20, 2014) ("[T]he Alaska State Legislature urges the United States Congress to restore the presumption of a service connection for Agent Orange exposure to United States Veterans who served in the waters defined by the combat zone and in the airspace over the combat zone . . . ."); *see also* 160 CONG. REC. S4217-01, S4423 (July 7, 2014) ("[T]he House of Representatives of the State of Arizona, prays . . . [t]hat the United States Congress restore the

presumption of a service connection between Agent Orange exposure and subsequent illnesses to United States Vietnam War veterans who served in the waters, which is defined as the combat zone, and in the airspace over the combat zone."). Other states and localities urged Congress to apply the presumption for veterans who served in the "territorial waters" or "offshore waters," and "airspace" of Vietnam. *See* 155 CONG. REC. E2166-04, E2167 (July 31, 2009) ("The 81st Legislature of the State of Texas respectfully urge [Congress] to restore the presumption of a service connection for . . . veterans who served on the inland waterways, in the territorial waters, and in the airspace of the Republic of Vietnam . . . ."); 160 CONG. REC. S3290-05, S3291 (May 22, 2014) ("The House of Representatives [of Pennsylvania] respectfully urge . . . Congress . . . to restore the presumption of a service connection for . . . veterans who served on the inland waterways, territorial waters and in the airspace of Vietnam . . . ."); 159 CONG. REC. E1889-01, E1889 (Dec. 16, 2013) ("The United States Congress should . . . direct the [VA] to administer the Agent Orange Act under the presumption that herbicide exposure . . . includes [Vietnam's] inland waterways, offshore waters, and airspace . . . .").

In Congressional hearings, the Congressional Budget Office provided data and estimated that 229,000 veterans were presumptively exposed to Agent Orange in the Vietnam Service Medal area, 55,000 more veterans than the Congressional Research Service estimated were serving in the territorial seas of Vietnam. *See* Veteran Benefits Legislation, 2015 WL 3378295 (May 13, 2015). The MVA participated in Congressional hearings and pointed out differences between various criteria used to determine "service in the Republic of Vietnam," including the Vietnam Service Medal area, the territorial seas of Vietnam, and the "foot-on land" rule. *See id.* ("Historically . . . the M21-1 Manual[] allowed the presumption to be extended to

all veterans who had received the Vietnam service medal . . . . In a February 2002 revision to the M21-1 Manual, the VA . . . required a showing that the veteran has set foot on the land or entered an internal river or stream."); Pending Legislation, 2017 WL 1281456 (Apr. 5, 2017) ("Prior to 2002, the VA granted the presumption of exposure to any ship that crossed the [Vietnam Service Medal demarcation line]. [The Blue Water Navy Vietnam Veterans Act] will restore the presumption only to a ship that crosses the [line demarcating the territorial seas].").

In 2015, an Institute of Medicine of the National Academy of Sciences report led the VA to presume herbicide-agent exposure for veterans who "regularly and repeatedly operated, maintained, or served onboard C-123 aircraft known to have been used to spray an herbicide agent during the Vietnam era." 38 C.F.R. § 3.307(a)(6)(v); *see also* Presumption of Herbicide Exposure and Presumption of Disability During Service for Reservists Presumed Exposed to Herbicide, 80 Fed. Reg. 35246-01, 35247 (June 19, 2015) (interim final rule).

A Senate resolution in 2017 "recognize[d] the intent of the Agent Orange Act of 1991 (Public Law 102-4) included the presumption that those veterans who served in the Armed Forces in the bays, harbors, and territorial seas of the Republic of Vietnam . . . served in the Republic of Vietnam for all purposes under the Agent Orange Act of 1991." 163 CONG. REC. S2219-03, S2220 (Apr. 4, 2017). In 2018, the National Academy of Sciences issued its *Veterans and Agent Orange: Update 11*, stating that "there was inadequate information to determine the extent of exposure experienced by Blue Water Navy personnel, but that there were possible routes of exposure," including ships drawing contaminated seawater to distill for potable water. NAT'L ACAD. SCI, VETERANS AND AGENT ORANGE: UPDATE 11 at 36 (The National Academics Press, 2018).

In 2019, this court held that the Republic of Vietnam includes its 12 mile territorial sea. *Procopio v. Wilkie*, 913 F.3d 1371, 1380–81 (Fed. Cir. 2019). This was codified by the Blue Water Navy Vietnam Veterans Act of 2019, Pub. L. No. 116-23, § 2, 133 Stat. 966 (codified at 38 U.S.C. § 1116A), stating "[a] veteran who . . . served offshore of the Republic of Vietnam . . . shall be presumed to have been exposed." The Act then defines the boundaries of "offshore" service based on a list of geographical coordinates that represent Vietnam's claimed territorial waters. *See* 38 U.S.C. § 1116A.

However, the airspace over Vietnam was not included in the scope of the Act, as Congressman Mark Takano submitted that "an aircraft that passed in the airspace above the offshore waters would not have drawn water from the sea and therefore is not considered present within the offshore waters for purposes of this legislation." H.R. REP. NO. 116-58, at 11–12 (2019), *reprinted in* 2019 U.S.C.C.A.N. 279, 280–82. Still, Rep. Takano stated that "the Committee intends that VA's definition . . . be broad and comprehensive." *Id.* at 11. The House Report also referred to the Institute of Medicine's conclusion that, given the passage of time and lack of data collected during the conflict, definitive answers concerning Blue Water Navy Veterans' exposure to Agent Orange are not available, and are unlikely to ever become available. *Id.* at 10.

Debate continued, along with legislative attention. On August 10, 2022, President Biden signed the Sergeant First Class Heath Robinson Honoring Our Promise to Address Comprehensive Toxics Act of 2022, Pub. L. No. 117-168, 136 Stat. 1759 (codified at 38 U.S.C. §§ 1116 and 1710) ("the PACT Act"), effective October 1, 2022. The PACT Act included provisions relevant to Agent Orange exposure for Vietnam era veterans who served in Thailand, as we shall discuss.

### DISCUSSION

MVA's 38 U.S.C. § 502 petition is directed to the designated "Thailand Rules," the "Blue Water Navy Rule," and the "Airspace Rule," with respect to presumptions of Agent Orange exposure and service connection, as administered by VA statutes, regulations, and M21-1 Manual provisions. Similar issues for other areas and additional background are reported in our decision in *Military Veterans Advocacy, Inc. v. Secretary of Veterans Affairs*, 38 F.4th 154 (Fed. Cir. 2022).

We review § 502 petitions to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706; *McKinney v. McDonald*, 796 F.3d 1377, 1383 (Fed. Cir. 2015). We will "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### A

### THE THAILAND RULES

The challenged Thailand Rules concern the scope of the presumption of exposure to Agent Orange for veterans who served on military bases in Thailand.

The relief that MVA requested of the VA, and subsequently this court, relating to the Thailand Rules has now been provided in part by the PACT Act as follows.

In 2010, the Secretary responded to congressional concern and amended the M21-1 Manual to apply the presumption of service connection to veterans who were stationed in Thailand during the Vietnam era. However, the presumption was limited to veterans whose duties placed them "at or near the base perimeter," for defoliant use was primarily at the perimeter. M21-1 Manual, Section IV (ii)(2)(C)(10)(q) (Oct. 4, 2010). This provision had

not substantively changed since 2010, despite petitions for rulemaking, legislative hearings, and the filing of this § 502 petition.  Then, in 2022 the requested change was partially made in the PACT Act, enacted while this case was pending:

> PACT Act § 403. **Presumptions of service connection for diseases associated with exposures to certain herbicide agents for veterans who served in certain locations.—**
>
> ***
>
> (d) In this section, the term "covered service" means active military, naval, air, or space service— . . . . (2) performed in Thailand at any United States or Royal Thai base during the period beginning on January 9, 1962, and ending on June 30, 1976, without regard to where on the base the veteran was located or what military job specialty the veteran performed . . . .

136 Stat. 1759, 1780–81 (amending 38 U.S.C. § 1116).

In view of this enactment, we requested briefing from the parties concerning its effect on MVA's § 502 petition.

The Secretary responded that "the PACT Act does not moot MVA's 'Thailand Rules' challenge . . . . because it does not provide MVA with the full extent of the relief that it had sought from VA and this court," referring to a discrepancy in the chronological period covered by the PACT Act (January 9, 1962–June 30, 1976), and the period used by the VA in the Thailand Rules context (February 28, 1961–May 7, 1975).  Sec'y Suppl. Resp. Br. 2–3, Sept. 14, 2022, ECF No. 56.  The Secretary stated that "there is [a] portion of MVA's 'Thailand Rules' challenge that remains live even after the PACT Act." *Id.* at 3–4.

But the MVA wrote that "the PACT Act provides the full relief requested by MVA on behalf of its Thailand

veteran members, and any relief provided by this Court would not affect their legal interests." MVA Suppl. Resp. Br. 7, Sept. 14, 2022, ECF No. 57 (citations omitted). MVA did not agree with the Secretary that any part of its challenges to the Thailand Rules remained live, so it appears that the MVA has waived its challenges to the Thailand Rules to the extent that its challenges were not moot.

The Thailand Rules portion of the petition is accordingly dismissed.

## B

### THE BLUE WATER NAVY RULE

As an initial matter, the Secretary argues that MVA does not have associational standing to challenge the Blue Water Navy Rule, as well as the other M21-1 Manual provisions at issue. To establish associational standing, an organization must show that:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*NOVA*, 981 F.3d at 1368 (citations omitted). The Secretary accepts that this § 502 action meets *NOVA*'s requirements as described in (b) and (c), but the Secretary argues that "[n]one of the manual revisions MVA disputes affect any of its members' substantive rights." Sec'y Br. 29.

The MVA filed affidavits of two of its members, stating uncertainty as to whether their claims are covered by the current Blue Water Navy rule. Section 502 authorizes petitions for clarification of VA Rules when there is "an actual or potential claim [that] is sufficiently affected by the particular challenged rule to meet the requirements of actual or imminently threatened concrete harm and the other

requirements for that member to have Article III standing." *NOVA*, 981 F.3d at 1370. Having reviewed the record, we do not agree with the Secretary that the MVA lacks organizational standing here.

With respect to the Blue Water Navy Rule portion of the § 502 petition, we do not share MVA's view that the VA's interpretation of the Blue Water Navy Vietnam Veterans Act of 2019 unduly narrowed the presumption of exposure and service connection as applied to shipboard service. MVA Br. 1–5.

The initial regulations as adopted in 1993 stated that the presumption of service connection regarding Agent Orange exposure applied to shipboard veterans with "[s]ervice in the waters offshore and service in other locations if the conditions of service included duty or visitation in the Republic of Vietnam." 38 C.F.R. § 3.307(a)(6)(iii) (1993). As noted *supra*, in 2002 the VA began interpreting this regulation to require a veteran to show some service on *land* within Vietnam applying the "foot-on-land" or "boots-on-the-ground" policy. *See* M21-1 Manual, Pt. III, para. 4.24(e)(1) (Feb. 27, 2002).

This court previously upheld that interpretation as within the Secretary's discretion. *See Haas v. Peake*, 525 F.3d 1168, 1193 (Fed. Cir. 2008) ("Drawing a line between service on land, where herbicides were used, and service at sea, where they were not, is prima facie reasonable."). Thus naval service without foot-on-land presence did not create a presumption of service connection for veterans who became afflicted with the designated conditions.

The foot-on-land rule was the subject of ongoing debate, and in 2019 we overruled *Haas* and held that the presumption of service connection does not require presence on mainland Vietnam. *Procopio*, 913 F.3d at 1376 ("[W]hen the Agent Orange Act was passed in 1991, the 'Republic of Vietnam' included . . . its 12 nautical mile territorial sea.").

The requirement for "duty or visitation" onshore was eliminated. *Id.* at 1377–78. This decision led to the Blue Water Navy Vietnam Veterans Act of 2019, which provides:

> 38 U.S.C. § 1116A(b). **Exposure.**— A veteran who, during active military, naval, or air service, served offshore of the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975, shall be presumed to have been exposed during such service to an herbicide agent unless there is affirmative evidence to establish that the veteran was not exposed to any such agent during that service.

This presumption is implemented in the M21-1 Manual, Section IV (ii)(1)(H)(1)(g), referring to service on vessels operating in "eligible offshore waters." The question as presented in MVA's § 502 petition relates to the definition of "eligible offshore waters." The Blue Water Navy Vietnam Veterans Act of 2019 defines "offshore of Vietnam" as within the traditional 12 nautical mile limit of territorial sea:

> 38 U.S.C. § 1116A(d). **Determination of Offshore.**— Notwithstanding any other provision of law, for purposes of this section, the Secretary shall treat a location as being offshore of Vietnam if the location is not more than 12 nautical miles seaward of a line commencing on the southwestern demarcation line of the waters of Vietnam and Cambodia and intersecting the following points . . . [longitudinal and latitudinal coordinates].

MVA argues that the 12 nautical mile limit should not apply, for *Procopio* and 38 U.S.C. § 1116(d) did not limit Vietnam's territorial waters to any specific nautical mileage, nor did the court define offshore waters by longitude and latitude as in 38 U.S.C. § 1116A. MVA argues that these delineations are contrary to this court's holding in

*Procopio* and asks this court to assure that the presumption of service connection applies to all naval and air service "throughout the Vietnamese theater of combat." MVA Reply Br. 32. MVA points out that "§ 1116A captures some 360 square nautical miles of the sea that lie outside the territorial sea of the Republic of Vietnam." MVA Br. 39. MVA also argues that "§ 1116A does not capture the entire territorial sea of the Republic of Vietnam," such as the sea near the island of Phu Quoc, *id.*, and states that those areas should be deemed covered by the presumption in view of our ruling in *Procopio*, where we stated that "all available international law, including but not limited to the congressionally ratified 1958 Convention, confirms that, when the Agent Orange Act was passed in 1991, the 'Republic of Vietnam' included both its landmass and its 12 nautical mile territorial sea," 913 F.3d at 1376.

The Secretary states that it was Congress, not the VA, that defined the geographic scope of what "offshore" areas were included within the Blue Water Navy Vietnam Veterans Act of 2019. *See* Sec'y Br. 52. The Secretary argues that Phu Quoc is not within § 1116A and that, "[i]f MVA wishes to challenge the scope of the plain reach of the statute, it must direct that grievance toward Congress." *Id.* We agree with the Secretary that, if any changes are warranted, the legislative process is the appropriate forum.

MVA also objects to the remand of authority from the regional offices to a centralized team of administrators for processing claims for Agent Orange exposure. In accordance with the Blue Water Navy Vietnam Veterans Act of 2019, the M21-1 Manual was amended to state:

> ROs are no longer authorized to establish if a Veteran's service qualifies for herbicide exposure in RVN claims. The centralized processing teams will be responsible for all adjudication activities involved in processing blue water Navy contentions . . . .

M21-1 Manual, Section IV (ii)(1)(H)(1)(a). MVA states that
the 2019 "withdrawal of authority from the Regional Of-
fices leaves Blue Water Navy veterans who served outside
the area defined in § 1116A completely unable to obtain a
presumption of service connection in the initial adjudica-
tion of their claims." MVA Reply Br. 19. MVA's criticism
appears to be unwarranted, and unresponsive to the notion
that a centralized team of experienced claim administra-
tors is a desirable step in the area of complex medical sci-
ence.

The petition with respect to review of the Blue Water
Navy Rule is denied.

C

THE AIRSPACE RULE

After the Agent Orange Act was enacted in 1991, ques-
tions soon arose as to what should constitute service "in the
Republic of Vietnam" under the Act. The VA's general
counsel issued an opinion that concluded, for purposes of
the presumption of service connection regarding Agent Or-
ange exposure under 38 C.F.R. § 3.313, "'service in Vi-
etnam' does not include service of a Vietnam era veteran
whose only contact with Vietnam was flying high-altitude
missions in Vietnamese airspace." VA Office Gen. Couns.,
*Prec. Op. 7-93 Service in Vietnam under 38 C.F.R. § 3.313*
(Aug. 12, 1993), https://www.va.gov/ogc/opinions/1993prec-
edentopinions.asp. This position was reflected in the
M21-1 Manual, Section IV (ii)(2)(C)(3)(e) (the "Airspace
Rule"). Efforts to remove the "high-altitude missions" lim-
itation have not succeeded, as summarized *supra*. MVA
asks us to act under § 502 to "invalidate the Airspace Rule
as contrary to the governing statute, international law, and
[our] recent decision in *Procopio*." MVA Br. 29. MVA states
that our reasoning in *Procopio* that explained the Agent
Orange Act should be interpreted consistently with inter-
national law compels the conclusion that the "Republic of

Vietnam" includes the airspace above its territory.  Thus MVA states that a regulatory exception for "high-altitude missions" should be corrected by action under § 502.

MVA provided the affidavit of Frederick Hinchliffe, a U.S. Navy veteran who flew bombing missions over Vietnam, but never landed in the country.  Hinchliffe states that on one of his bombing runs over South Vietnam at 3,000 feet, "the air was significantly thick with yellowish haze" and "all vegetation was defoliated." *Id.* at A3–A4. However, flying at 3,000 feet is not a high-altitude mission, as admitted by MVA.  *Id.* at 26–27.

MVA states that "if the Airspace Rule were vacated, Mr. Hinchcliffe [sic] would be able to show that he should be granted the presumption of service connection under a correct interpretation of the governing statutes and case law." MVA Reply Br. 11.

The Secretary argues that MVA's challenge to the Airspace Rule is time barred under 28 U.S.C. § 2401(a), for the exclusion of high-altitude missions from the presumption of service connection has been the rule since 1993, and that the December 2019 M21-1 Manual revisions merely republished the Airspace Rule with a change to capitalization. *See* Sec'y Br. 34–37; 28 U.S.C. § 2401(a) ("Except as provided by chapter 71 of title 41, every civil action commenced against the United States shall be barred unless the complaint is filed *within six years after the right of action first accrues*." (emphasis added)).  We agree with the Secretary that MVA's challenge to the Airspace Rule is barred by the six-year limit provided in § 2401(a) because the rule has been in full force and effect since 1993.  *See* Sec'y Br. 34–35.

However, even if the time bar did not apply, we also agree with the Secretary on the merits.  The Secretary supports the current Airspace Rule by citing the statement in H.R. REP. NO. 116-58, at 11–12 (2019), *reprinted in* 2019

U.S.C.C.A.N. 279, that "an aircraft that passed in the airspace above the offshore waters would not have drawn water from the sea and therefore is not considered present within the offshore waters for purposes of this legislation." Because Congress is presumed to have had knowledge of the VA's Airspace Rule, the Secretary argues this statement signals that Congress chose not to enlarge the presumption of service connection with respect to high-altitude flights. *See* Sec'y Br. 44–45.

The Secretary points out that Congress has consistently preserved the high-altitude exception since its adoption in 1993. *See id.* at 44–46. It appears that Congress has, again, not accepted the position that MVA requests of the court. In the recently enacted PACT Act, in which Congress broadened the Thailand Rules, Congress explicitly included airspace service in the toxic exposure presumption for certain designated locations, but not Vietnam. *See* PACT Act, 136 Stat. at 1778 (defining "covered veteran" for certain toxic exposure presumption purposes as "any veteran who . . . performed active military, naval, air, or space service while assigned to a duty station in, including the airspace above [the named countries]").

The petition with respect to the Airspace Rule must be denied.

CONCLUSION

This petition under 38 U.S.C. § 502 is dismissed as to the Thailand Rules and denied as to the Blue Water Navy Rule and the Airspace Rule.

**DISMISSED IN PART, DENIED IN PART**

COSTS

No costs.